**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-119-DLB-JGW**

**TERESA DAVIS**                                                                                           **PLAINTIFF**

**vs.**                                   **MEMORANDUM OPINION AND ORDER**

**L'ORÉAL USA S/D, INC.**                                                                  **DEFENDANT**

* * * * * * * * * * * * * * * * *

Plaintiff Teresa Davis commenced this action against her employer, Defendant L'Oréal USA S/D, Inc., for allegedly subjecting her to a hostile work environment based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.* Specifically, Plaintiff alleges that Wayne Imhoff, a coworker, sexually harassed her over several months, creating a hostile work environment for which Defendant is liable.  The Court has federal question jurisdiction over the Title VII claim under 28 U.S.C. § 1331, as well as federal civil rights action jurisdiction pursuant to 28 U.S.C. § 1343.

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. # 14).  The motion has been fully briefed (Docs. # 18 and 20), and is now ripe for review. For the reasons set forth below, Defendant's motion is **granted**.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Defendant L'Oréal USA S/D, Inc. ("L'Oréal") hired Plaintiff Teresa Davis in March of 2001 to work at its facility in Florence, Kentucky.  (Doc. #14-3, at 13-14).  She has subsequently worked several jobs on various shifts, and is still with the company.  (*Id.* at

1

15-20).  This case primarily stems from her time working as a raw material sampler on the second shift during several months in 2009 and 2010.[1]  (Doc. #14-4, at 10, 43); (Doc. #14-6, at 7).

In the summer of 2009, L'Oréal assigned Wayne Imhoff, who had worked at the company since 2003, to work with Plaintiff on the chemical receiving dock.  (Doc. #14-3, at 30, 140); (Doc. #15); (Doc. #14-6).  Wayne[2] made her feel "very, very uncomfortable" on the first night they worked together by staring at her breasts and "private area" rather than looking at her face.  (Doc. #14-3, at 31-32, 35).

Thereafter, Wayne's behavior persisted, as he would come over and look at Plaintiff's crotch and breasts "all the time."  (*Id.* at 39).  To facilitate such behavior, Wayne would ask a work-related question and then begin staring at her.  (*Id.* at 34-35).  At her deposition, Plaintiff described her confrontations with Wayne as follows:

> We were usually standing up, and we were usually on the dock, and he would tell me that he could not – he didn't remember or – he was wanting me to explain more of the job, but yet he would never look me in the face.  He would look at my boobs and he would look at my private area, and it made me feel very, very uncomfortable.

(*Id.*).  In so doing, he would invade her personal space and even attempt to smell her:

> A: He would come too close to me and you could tell that he was trying to smell, and he made it very obvious.
>
> Q: How did he make it obvious?

---

[1] Defendant notes that, at some point early in her employment, one of Plaintiff's supervisors made an inappropriate comment, which she subsequently reported.  (Doc. #14-3, at 110).  Consequently, the supervisor "never did it again."  (*Id.*).  More importantly, Plaintiff did not mention this incident in either her Complaint or brief.  (Docs. # 1, 18).

[2] Two of the individuals involved in this case–Plaintiff Teresa Davis and Joe Davis–share the same last name.  For this reason, the Court will refer to all of the individuals herein by their first name.

A: Well, he would come too close to me and you could – he would (demonstrating sound) do this to me.

Q: Like sniffing?

A: Yes.

(*Id.* at 35).

Plaintiff made it perfectly clear to Wayne that his behavior was not acceptable, but he was undeterred.  (*Id.* at 49).  Instead, Wayne made physical contact with her on two separate occasions, although the time frame with respect to these events and Plaintiff's attendant complaints to L'Oréal are unclear.[3]

According to Plaintiff, the first incident of physical contact occurred in the small copy room near their office space.  *Id.* at 39-41.  Wayne came in the room, got behind her, and rubbed his "private area" on her back, and then just stood there.  (*Id.* at 41).  This made her very uncomfortable, as she could tell that he was aroused because his penis was erect. (*Id.* at 43).

---

[3]For instance, Plaintiff asserts in her response brief that the first incident occurred in September of 2009.  (Doc. #18, at 2).  However, the Court cannot find any evidence directly supporting this time frame.  In fact, the only evidence that the Court can find that even speaks to when the first incident occurred is the testimony of Eileen Walz, who only relayed what she was told by Plaintiff:

Q: Right.  Right.  Okay.  Well – but, I mean, as far as there being this – she generally had reported some sort of allegations in September of 2009, and then reporting again, or reporting, I guess, more allegations, I don't want to testify here, in March of 2010.  Those two dates are more or less accurate?

A: The September date I can't state is accurate.  Teresa stated to me that it was in September.

(Doc. #14-4, at 24).

3

Plaintiff immediately reported the copy room incident to Rob Corns, the "lead" for the second shift, who responded that he would take it up with Joe Davis, Plaintiff's supervisor. (Doc. # 14-3, at 33, 44); (Doc. # 14-4, at 38).  This was the first time Plaintiff reported Wayne's conduct to anyone at the company.  (Doc. # 14-3, at 43)

Rob never confirmed to Plaintiff that he spoke to Joe, nor did Joe inform her that Rob spoke with him about the incident.  (*Id.* at 44-45).  Presumably this is because Rob only told Joe that Plaintiff "felt uncomfortable with Wayne, that his eyes were fixed on her breasts and/or crotch."  (Doc. #14-6, at 16-17).  According to Joe, Rob did not relay any other allegations to him, particularly about the incident in the copy room  (*Id.*).

Sometime later, Plaintiff received a visit from Joe, and she assumed that he was going to talk to her about the report she made to Rob.  (Doc. #14-3, at 51).  This, however, was not the topic *du jour*:

> A: I had talked to Rob, and then Joe came down, and I assumed that he was going to talk to me about that, but it was a total different thing.  He came down telling me that I needed to make sure that Wayne Imhoff was getting the proper training, that he had – he wanted Wayne to learn the job and he wanted me to tell him everything that needed to be done.
>
> Q. Okay.
>
> A: And he said, you do understand what I wanted you to do, and he was talking to me as if I was not doing my job.

(*Id.*).  In response, she told Joe that she had been trying to train Wayne, but he had used it as an opportunity to make her feel uncomfortable.  (*Id.* at 52).  She then told him about the staring and the incident in the copy room.  (*Id.*).  Joe seemed surprised, but indicated that he would take care of the problem.  (*Id.* at 53).

Joe then met with Wayne, who denied engaging in the alleged conduct. (Doc. # 14-6, at 19); (Doc. # 14-4, at 26). After speaking with both parties, Joe considered this nothing more than a "he said/she said." (Doc. # 14-6, at 19). Nonetheless, Joe advised Wayne of various techniques to use to avoid making Plaintiff uncomfortable while asking her questions, such as avoiding standing behind her and looking/kneeling off to the side. (Doc. # 14-4, at 26).

For the next few days following Joe's visit, Wayne worked without asking for advice, but his improper behavior resumed shortly thereafter. (Doc. #14-3, at 54). Specifically, Wayne again rubbed against Plaintiff as she was bent over putting labels on boxes. (*Id.* at 132). Again, Plaintiff expressed concern to Wayne about his conduct. (*Id.*).

Plaintiff eventually decided to file a formal complaint. (*Id.* at 54). She first met with Joe and told him the same things she had conveyed earlier, and then spoke to Eileen Walz, the assistant vice president of human resources, in March of 2010. (Doc. #14-3, at 54-55, 68-69); (Doc. #14-4, at 8). Plaintiff again generally expressed her concerns to Eileen, although she did not provide graphic detail. (Doc. #14-3, at 68-69). Specifically, she told Eileen that Wayne stood behind her and rubbed his "private area" on her, and also told her about all the times he came into the office and looked down her shirt and at her crotch. (*Id.*). Finally, she told Eileen that she did not want to work with Wayne anymore. (*Id.* at 70).

Based on these meetings, Plaintiff was allowed to work on the first shift to get away from Wayne while Eileen investigated her complaints. (Doc. #14-3, at 70); (Doc. #14-4, at 28). Eileen's investigation involved meeting with Plaintiff, Wayne, and all of the people Plaintiff identified to substantiate her claims. (*Id.*) Eileen, though, was unable to

5

substantiate Plaintiff's complaints and therefore told Plaintiff that she had to go back to the

second shift, but Plaintiff again refused to work with Wayne.  (Doc. #14-3, at 72); (Doc.

#14-4, at 41).  This, of course, created a problem:

> Q: And your recollection is that she told you you've got to go back to work
> with Wayne on second shift or you've got no job?
>
> A: No, it wasn't that.  She said – let me think.  That was the only that was
> available.
>
> Q: So did she ever tell you if you don't want to go back and work in your
> position that we're willing to transfer you to another position?
>
> A: She said she would be willing to look into it to see if there was other
> positions.
>
> Q: She told you at the time you had this conversation where she got back
> with you on the investigation?
>
> A: After I told her I would give my position up, I would not work with Wayne
> Imhoff.
>
> Q: Okay.  So then she said okay, let's see what else is around?
>
> A: She said she would look around, but she couldn't guarantee any shift or
> job.  I would have to take whatever was available.
>
> Q: All right.  And so what happened after that?
>
> A: I still – my job went up for bid.[4]

(Doc. #14-3 at 74-75).

However, this conflict–Plaintiff's refusal to work with Wayne versus her limited job

opportunities–somewhat resolved itself.  Shortly after Plaintiff returned to her chemical-

receiving position on the second shift, Wayne took a leave of absence, and he was placed

---

[4]By saying that her job "went up for bid," she meant that the company posted the job for
someone to replace her.  (Doc. # 14-3, at 77).

on the opposite side of the building when he returned in September of 2010. (Doc. #14-3, at 76-78); (Doc. #14-5, at 17). Furthermore, Plaintiff continued at that job and shift, and still maintains both as of January 27, 2012. (Doc. #14-3, at 79). However, Wayne continued watching her when she walked to his side of the building. (*Id.* at 142).

Based on the foregoing, on June 8, 2011 Plaintiff commenced this action against L'Oréal for allegedly subjecting her to a hostile work environment based on sex. (Doc. # 1). Discovery having since been completed, Defendant now moves for summary judgment. (Doc. # 14-1).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Accordingly, in deciding a motion for summary judgment, courts must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As is clear from the face of Rule 56, the "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted).  Once the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Rather, the nonmoving party must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir.

1998).

## III.   HOSTILE WORK ENVIRONMENT CLAIMS

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986) the United States Supreme Court held that  "a claim of 'hostile environment' sex discrimination is actionable under Title VII."

Although the scope of a hostile work environment claim encompasses both harassment committed by supervisors and coworkers, the theory of liability differs depending on the identity of the employee committing the conduct.  At least with respect to coworker harassment cases, such as the case herein, the employer's liability is direct–not derivative.  *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 n.11 (6th Cir. 1994)). This is because "the employer is being held directly responsible for its own acts or omissions."  *Id.*

Having set forth the foundation of a hostile work environment claim stemming from coworker conduct, the Court turns to Defendant's motion.

## IV.   ANALYSIS

To establish a coworker hostile work environment claim, a plaintiff must show (1) that she is a member of a protected class, (2) that she was subjected to unwelcome sexual harassment, (3) that the harassment was based on her sex, (4) that the harassment

8

created a hostile work environment, and (5) that the employer is liable. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).[5] Defendant contends that Plaintiff has failed to establish elements (4) and (5) of her claim. Because the Court agrees with Defendant that Plaintiff has failed to establish employer liability, and that finding is dispositive, the Court need not address whether the harassment herein created a hostile work environment.

To establish employer liability, a plaintiff must show that (1) the employer knew or should have known of the harassment and (2) that its response manifested indifference or unreasonableness in light of the facts. *Blankenship*, 123 F.3d at 873.[6] "Significantly, a court must judge the appropriateness of a response by the frequency and severity of the alleged harassment. Generally, a response is adequate if it is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) (citations

---

[5]*Clark* dealt with a claim brought under the Kentucky Civil Rights Act. However, a claim brought under the Kentucky Act "is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart." 400 F.3d at 347 (citation omitted).

[6]Plaintiff notes that *Blankenship* has since been modified by the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) to mean that "an employer may be held liable when its remedial response is merely negligent, however well-intentioned." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 684 n.3 (6th Cir. 2005). The United States District Court for the Southern District of Ohio addressed this point in *Chancellor v. Coca-Cola Enterprises, Inc.*, 675 F. Supp. 2d 771, 781 (S.D. Ohio 2009):

> [I]n *Mullins v. Goodyear Tire & Rubber Co.*, 291 Fed.Appx. 744, 748 (6th Cir.2008), the Sixth Circuit stated that its decision in *Hawkins*, 517 F.3d [321,] 339 (6th Cir. 2008), "removed any doubt that the *Blankenship* standard survives" and that *Blankenship* remains good law for the proposition that an employer may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

The Court agrees with and adopts this analysis, and will thus continue to apply the *Blankenship* standard. *See also Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 n.6 (2004) ("*Ellerth* and *Faragher* expressed no view on the employer liability standard for co-worker harassment. Nor do we.").

omitted).

In this case, there are essentially three instances in which a company representative was put on notice as to Wayne's conduct.  First, Plaintiff complained to Rob Corns.  Rob then passed along some of Plaintiff's complaint to Joe Davis, who then learned more allegations when he met with Plaintiff.  Finally, Plaintiff filed a complaint with human resources.  Because L'Oréal was not required to respond until it knew of the harassment,[7] the Court must assess each of these intervals in chronological order.

### A.    Complaint to Rob Corns

As noted, Plaintiff immediately reported the copy room incident to Rob Corns, the "lead" on the second shift.  However, Plaintiff makes no argument that he was a supervisor or department head, or that she reasonably believed that Rob, as a "lead," was authorized to receive and respond to or forward such complaints to management.  *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 277 (6th Cir. 2009) (citation omitted) ("An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized-or is reasonably believed by a complaining employee to have been authorized-to receive and respond to or forward such complaints to management.").  In fact, Plaintiff asserts that Joe Davis was the first manager to learn

---

[7]Admittedly, the question is whether the employer knew or *should have known of the conduct*, so an employer can, in certain circumstances, be liable even if the employee does not report the harassing behavior:

> To establish that the employer "knew or should have known" of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor. Where harassment is pervasive, knowledge may be imputed to the employer.

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009) (citations omitted). Plaintiff, though, has provided no other basis for Defendant's knowledge, and makes no argument to that effect.

about the complaint *when Rob reported it to him*, yet Joe failed to resolve the problem. Accordingly, there is no genuine issue of material fact as to the first interval in the time line.

### B. Complaint to Joe Davis

Plaintiff's primary contentions relate to the response, or lack thereof, of Joe Davis.[8] In support, Plaintiff primarily relies upon the unpublished decision of the United States District Court for the Middle District of Tennessee in *Blevins v. Famous Recipe Company Operations, LLC*, No. 3:08-CV-1196, 2009 WL 4574004 (M.D. Tenn. Nov. 30, 2009).

In *Blevins*, a cashier made several complaints to one of her shift managers that a coworker had been making offensive sexual comments to her and sometimes touching her inappropriately. *Id.* at *1. The manager, though, took no corrective action even though he personally witnessed some of the harassment, and the coworker ultimately poured water down her shirt two weeks after her initial complaint. *Id.* Assuming the manager was a supervisor, the United States District Court for the Middle District of Tennessee held that a jury could find that his response (or lack thereof) qualified as unreasonable indifference, and in so doing rejected the employer's argument that it responded reasonably once the restaurant's general manager was informed of the conduct. *Id.* at *7.

The facts of this case, though, are distinguishable from the circumstances in *Blevins*. Here, Joe testified that Rob only told him that Plaintiff felt uncomfortable with Wayne because his eyes were fixed on her breasts and/or crotch–no other allegations were relayed to him. Furthermore, Plaintiff testified Joe never got back to her and let her know

---

[8]Defendant does not contest that Joe, as a supervisor, was authorized (or was at least reasonably believed by Plaintiff to have been authorized) to receive and respond to or forward sexual harassment complaints.

that Rob had told him about the incident, and that Joe seemed surprised when Plaintiff told him about the staring and the incident in the copy room. Viewing this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court must presume that Joe knew that Wayne had been staring at Plaintiff before he conversed with her, but did not learn about the copy room incident until that conversation.

As an initial matter, Joe was under no obligation, as a matter of law, to respond based on the information he knew at the time–that Wayne's eyes were fixed on Plaintiff's breasts and/or crotch. As the Eleventh Circuit has concluded, constant staring, without more, does not create a hostile work environment. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1250 (11th Cir. 1999) ("Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent' . . . ."). Joe was not aware of any conduct constituting harassment at this juncture, so neither he nor anyone else on the company's behalf could be expected to respond. In the alternative, even if the Court believed that Wayne's purported staring constituted a modicum of harassment, the evidence shows that Joe met with Plaintiff after he spoke to Rob, which was an adequate response as a matter of law.

Plaintiff has also failed to establish the existence of a genuine issue of material fact as to Joe's response once he learned about the copy room incident. After Plaintiff told Joe about the incident, Joe met with Wayne, who denied engaging in the alleged conduct. Based on speaking with both parties, Joe considered the issue to be nothing more than a "he said/she said" situation, but still advised Wayne of various techniques to use to avoid making Plaintiff uncomfortable while asking her questions. *See Scarberry v. Exxonmobil*

12

*Oil Corp.*, 328 F.3d 1255 (10th Cir. 2003) (holding that an employer's response was adequate as a matter of law because the company, among other things, counseled the alleged harasser).  While the company may have done more, no reasonable juror could find that Joe's response manifested indifference or unreasonableness in light of the conduct alleged.[9]

### C.    Complaint to Human Resources

After Plaintiff filed a complaint with human resources, Eileen Walz immediately conducted a thorough investigation and allowed Plaintiff to work on the first shift to get away from Wayne during that time.   Furthermore, even though Eileen could not substantiate Plaintiff's claim, Plaintiff ultimately remained separated from Wayne, as he took a leave of absence soon after the investigation concluded, and was then placed on the opposite side of the building when he returned.     In view of the company's remedial actions, no reasonable jury could find that the company's response manifested indifference or unreasonableness, especially in light of the Ninth Circuit's decision in *Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001).   In that case, a mail sorter was subjected to several inappropriate remarks by a coworker and eventually inappropriate physical contact.  *Id.* at 1189.  In response, the United States Postal Service separated the two employees pending

---

[9] Both parties attempt to assess the reasonableness of the company's response based on how Wayne reacted.  Specifically, Defendant points out that his behavior improved for a few days, while Plaintiff notes that the response ultimately failed to resolve the problem.  However, the question is whether the response was unreasonable or indifferent–not whether it was effective. *Scarberry*, 328 F.3d at 1259 ("The record establishes that the warning discouraged Simpson from openly harassing others, but a company cannot predict when an employee will take another approach to harassment designed to avoid detection and discipline, as Simpson apparently did in this case.  The test is whether the employer's response to each incident of harassment is proportional to the incident and reasonably calculated to end the harassment and prevent future harassing behavior.").

the outcome of a thorough investigation that had commenced immediately after the employee complained, and then kept them permanently separate even though the investigation could not sustain a charge of sexual harassment.  *Id.* at 1192-1194. Unsurprisingly, the court determined that the Postal Service took appropriate and prompt corrective action.  *Id.* at 1198.

In sum, no reasonable jury could find the company's response at any of the enumerated intervals was inadequate.  As a result, Plaintiff cannot establish a coworker hostile work environment claim as a matter of law.

**V.    CONCLUSION**

Accordingly, for the reasons stated herein, **IT IS ORDERED** that

(1)    Defendant's Motion for Summary Judgment (Doc. # 14) is **granted**;

(2)    This action be, and is hereby **dismissed and stricken from the active docket**;

(3)    A Judgment in favor of Defendant will be entered concurrently herewith.

This 27th day of November, 2012.



Signed By:

*David L. Bunning*   *DB*

United States District Judge

G:\DATA\Opinions\Covington\2011\11-119 MOO Granting MSJ.wpd